OF THE

# UNITED STATES

FOR THE

## DISTRICT OF VERMONT.

### OCTOBER TERM, 1855.

---

### DeClancy Stoughton *v.* Justin Dimick.

*Seizure of vessel by military officer under the act of March 10, 1838, commonly called the neutrality act, (5 Stats. at Large, 212.) Statute of limitations.*

An officer belonging to a military force ordered out by the president, under the 8th section of the neutrality act of 1838, " to prevent the violation and enforce the due execution of the act," and instructed by his commanding general to execute that purpose, may seize property as a precautionary means to prevent an intended violation of the act, and detain it until an officer, having the power to seize and *hold* it for the purpose of proceeding with it in the manner directed, may be procured and act in the matter.

And where such officer seized a vessel, which was not intended, itself, to pass the frontier, but was laden with arms and munitions intended to be transported across the frontier to insurgents in Canada, who were then in arms near the line, against Great Britain, and the vessel was wrecked the same night without any fault of his, *it was held* that an action of trover for the vessel could not be sustained against him.

If the defendant had been otherwise liable, *it was held*, upon the facts found and stated in the opinion of the court, *q. v.*, that he had known attachable property in this state which would have barred the plaintiff's action under our statute of limitations on account of its not having been commenced until more than six years after the cause of action accrued.

In this case, a verdict was returned for the plaintiff, with damages assessed, on the issue joined upon a plea of *not guilty*, and for the defendant on the issue growing out of a plea of the statute of limitations. The verdict was taken, subject to the opinion of the court, on the law arising upon the facts proved, and was to stand, be altered or amended, and judgment rendered thereon, or set

Stoughton *v.* Dimick.

aside, and a new trial granted, according as that opinion might be. The facts and questions in the case will fully appear from the opinion delivered by the court.

*O. Stevens,* for the plaintiff.

*L. B. Peck,* district attorney, for the defendant.

The opinion of the court was delivered by

PRENTISS, J. This is an action of trover to recover the value of a vessel, taken and detained by the defendant while acting in the capacity of a military officer, under the act of congress of March 10, 1838, commonly called the neutrality act. Two questions arise in the case : 1. Whether the defendant had authority to take and detain the vessel. 2. Whether the action is barred by the statute of limitations.

1. Admitting that no officer but such as is mentioned in the first section of the act, collector, naval officer, surveyor, inspector of the customs, marshal, deputy-marshal, or other officer *specially appointed* by the president, *for the purpose,* could make a *seizure,* properly speaking, under the act, or in other words, could take property for the purpose of holding and proceeding with it in the manner prescribed by the act, the question still remains, whether the defendant, by taking the vessel in question into his possession, under the circumstances, and in the manner and for the purpose he did, assumed unauthorized power, and is consequently liable to the plaintiff for it.

By the eighth section of the act, it was made lawful for the president, or such person as he might empower for the purpose, to employ such part of the land or naval forces of the United States, or of the militia, as should be necessary "to prevent the violation, and to enforce the due execution, of the act." Under instructions from the president, and pursuant to the power thus given him, a military force, by orders issued by the secretary of war, was placed at different points upon the northern frontier at Niagara, at Sackett's Harbor, and at Plattsburgh upon Lake Champlain. The defendant was a captain in the army, stationed at the latter place, and was ordered by the commanding general of the station, to take post, with his company, at Rouse's Point on the lake, near the frontier

line, for the purposes mentioned in the section of the act just referred to, with instructions faithfully to execute those purposes. Under the orders thus given him, and while stationed at the post so assigned him, the defendant, at Champlain, a port a short distance this side of the line, took possession of the vessel. The vessel was fastened to the dock, but was wrecked and destroyed in the night of the same day by a storm, so that it could no longer be the subject of detention, of redelivery, or of any proceeding under the act.

Though the destination of the vessel was only to Champlain, and it was not intended to pass the line, it had arms and munitions of war aboard, which were intended to be taken across the line, though by another conveyance, to and for the use of the insurgents in Canada, then in arms near the line. If the vessel itself, as the plaintiff would maintain, was not liable to *seizure*, not being in fact, " *about to pass the line*," the arms and munitions of war aboard it, among which were eight tons of fixed ammunition, clearly were so liable; and these could not be seized and secured without, or otherwise than by arresting and taking possession of the vessel. And even supposing that the military force, so far as concerns seizures of property, was intended to act in aid of the civil authority, or rather of the civil officers mentioned in the first section of the act, and that the commander of such force had not the power of *seizure* those officers had, he might, at least, when necessary, take property, as a precautionary measure to prevent an intended violation of the act, and detain the property until an officer, having the power to *seize* and *hold* it for the purpose of proceeding with it in the manner directed, might be procured and act in the matter. Without such power, how could the military force fully perform the duty assigned it, or be effectually employed, " *to prevent the violation, and to enforce the due execution of the act?*" In this view, which is, perhaps, a view more limited and restricted than might be consistently taken, the defendant did not exceed the authority given him by the act; and as it does not appear that the loss of the vessel was the consequence of any want of ordinary care on his part, he cannot be held liable for it.

2. The plaintiff having, as appears from what has been said, no cause of action against the defendant, the question arising under the

statute of limitations ceases to be of any importance in the case. Still, the question having claimed and received consideration, it may be well to say a few words upon it, rather than pass it over in entire silence.

The statute of limitations of this state runs in favor of a party, although he be absent from and resides out of the state, if he have, to use the words of the statute, "*known property within the state, which could, by the common and ordinary process of law, be attached.*" The meaning and intention are that the statute shall not run in favor of a party who is not subject to process; but if he be subject to process, either by being personally within the state, or having known attachable property within it, the statute runs in his favor.

It was settled by the supreme court of the state, in the case of *Wheeler* v. *Brewer*, 20 Verm. 113, that, "actual knowledge of the property and of the defendant's title to it, need not be possessed by the plaintiff, if by reasonable diligence he would acquire that knowledge; but in order to warrant this inference, and thereby to bar the action, the defendant's ownership of the property must be notorious to such an extent, that it would not escape a reasonable search and inquiry on the part of the plaintiff." Taking this to be the law of the state, the inquiry here is, whether the defendant had such property, and whether the plaintiff, by reasonable diligence, might have obtained knowledge of it.

It appears that the defendant owned a large and valuable farm, with stock upon it, in Bennington, in this state, situate about two miles west of the village, on the great road to Albany, called and known as the Dimick farm, and formerly occupied many years by the defendant's father as a tavern stand. The farm consisted of two hundred acres, was of the value of six thousand dollars, and was conveyed to the defendant by his father, subject to a life estate in the father, by a deed duly executed and recorded in 1830. The father died in 1839, and the defendant has ever since leased the farm, with the stock upon it, to tenants, who have occupied it under him. Both farm and stock, during the whole time, have been set in the list, for the purpose of taxation, in the name of the defendant, with the name of the occupant, and were generally known in the town, which, it is to be observed, was not only the seat of

justice for the county, but a town otherwise of much note, to be the property of the defendant.

In addition to these facts, it is to be borne in mind, that Bennington, where the property was situate, was the dwelling-place of the family, while living, to which the defendant belonged, the place where he was brought up, and where he might, if anywhere, claim to have his domicil, though personally absent therefrom, except on occasional returns, during his long service in the army; and taking all the facts together, it appears to us, that they well warrant the conclusion, that the plaintiff might, in the course of the six years allowed him for inquiry, by using reasonable diligence and due means, have ascertained and attached the property.

Such being our opinion upon the several questions involved in the case, the defendant is, of course, entitled to judgment, and judgment must be entered up for him on the verdict accordingly.